**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLORADO**

Case No.:

FRANKLIN GALE,

      Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation;
STEPHANIE O'MALLEY, in her official capacity as Executive Director of the Denver
Department of Safety;

      Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

      Plaintiff, Franklin Gale ("Plaintiff" or "Gale"), by and through his legal counsel, Elkus &

Sisson, P.C., hereby submits his Complaint and Jury Demand.

**I.      PARTIES AND VENUE**

      1.      The Plaintiff is an individual who resides at 4378 Kirk Ct, Denver, CO 80249.

      2.      The Defendant, The City and County of Denver (hereinafter referred to as

"Denver") is a municipal corporation with administrative offices in the City and County of

Denver, State of Colorado.

      3.      The Defendant, Stephanie O'Malley (hereinafter referred to as "O'Malley") is the

Executive Director (alternatively, the Manager of Safety) of the Department of Safety with her

administrative offices located at 1331 Cherokee Street, Room 302, Denver, Colorado 80204.

The Department of Safety is comprised of seven public safety agencies and administrative

1

support functions that are unified through one Executive Director of Safety.  Defendant

O'Malley is responsible for oversight, supervision, training, and discipline of both the Denver

Police Department and the Denver Sheriff Department (hereinafter referred to as "DSD").  At all

times relevant to the subject matter of this litigation, Defendant O'Malley was a citizen of the

United States and a resident of Colorado and was acting under color of state law in her capacity

as the Executive Director of the Department of Safety for the City and County of Denver.

4.      The Manager of Safety, a position created by the Denver City Charter, is in

charge of the Department of Safety, which has full charge and control of DSD pursuant to

Denver, Colo., City Charter §§ 2.6.1, 2.6.2.  "[T]he manager of safety exercises the powers and

performs the duties of sheriff under the laws of the state" pursuant to the Revised Municipal

Code of the City and County of Denver § 14-122.  The Manager of Safety is the "appointing

authority" for purposes of Denver Career Service requirements for purposes of termination of

DSD employees pursuant to Denver, Colo., City Charter § 2.6.4.

5.      Collectively, Defendants Denver and O'Malley will be referred to as

"Defendants."

## II.      JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States and 42

U.S.C. §1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988.

7.      Venue in the United States District Court for the District of Colorado is proper in

that the action complained of took place in the State of Colorado, City and County of Denver,

and all the parties, upon information and belief, are residents of the state.

### III.    GENERAL ALLEGATIONS

**Gale's background**

8.      In August 1989, Gale began his employment with DSD.  Gale served as a Denver

Deputy Sheriff for 25 years and 5 months prior to his termination on or about January 21, 2015.

During his tenure with DSD, Gale received either "meets expectations" or "exceeds

expectations" on all of his performance evaluations.

9.      As of the date of Gale's termination, Gale was at the rank of a Captain but served

as acting Division Chief in charge of the Downtown Detention Center (hereinafter the "DDC").

10.      During Gale's tenure at DSD he had only one sustained disciplinary violation on

September 14, 2005, for which he received a written reprimand.

11.      As of the date of Gale's termination, he was one of the most highly decorated

Denver Deputy Sheriffs.  In fact, his commendations include receiving the Medal of Valor, two

Life Savings Medals, three Medals of Merit, a Community Service Medal, and a Department

Commendation Pin.

12.      Prior to his public service with DSD, Gale served honorably in the United States

Army from 1981-1987.  Gale's military occupational specialty, which is more commonly

referred to as "MOS," was 11B and 18B.  Gale rose to the rank of Staff Sergeant (E6) where he

served in Special Forces Units and was engaged in two combat deployments.  Gale received an

honorable discharge from the United States Army and numerous commendations.  During Gale's

years of military service he never received any disciplinary action.

13.      Gale was terminated from his employment with Denver on or about January 21,

2015, for alleged violations of policy including RR 200.4.2-Commission of a Deceptive Act,

RR-200.13-Disobeying a Lawful Order, and RR 300.11.6-Conduct Prejudicial.

14.     Gale's termination was politically motivated, based on unfounded allegations of misconduct, and was retaliation for his constitutionally protected speech.

15.     The Defendants ignored the law, their own policies and procedures, violations of policy committed by other employees in an effort to bolster their case against Gale, and even engaged in dishonesty at the highest level in an effort to silence Gale.

**Sheriff Elias Diggins' admission as to Defendants' true motives regarding Gale's termination**

16.     Sheriff Elias Diggins (interim Denver Sheriff at the time of Gale's termination) summarized the true motives and intentions of Defendants in a phone call that he made to Gale after Gale's pre-disciplinary hearing (which Sheriff Diggins was present for together with Deputy Manager of Safety Jess Vigil and Civilian Review Administrator Shannon Elwell). Sheriff Diggins stated in relevant part that:

> my recommendation was nowhere near termination and that at the end of the day what I said is where a reasonable person would land…I fought so fucking hard with these people [*i.e.* Civilian Review Administrator Elwell and Deputy Manager of Safety Jess Vigil]…it was to the point that I threw my hands up…I don't see how in the hell you get anywhere close to termination…what's your logic…and I don't even think in their explanation of the logic that they truly believe the shit.  We talked about before what they don't understand is they made martyrs out of people when they do stuff like this…and it's not in their favor when they are trying to move this organization "forward" and when you start having people pushing back on policy, procedure and practice only because they can and they want to…these assassins that have been hired in that office [*i.e.* Manager of Safety's Office] don't care about anything but blood and they don't see the long term picture…all they care about is that they have a trophy that they think they can hang on their wall…which is bull shit and it pisses me off.

17.     Subsequently, on or about October 8, 2015, Sheriff Diggins testified under oath that Gale was the "trophy" that the Department of Safety's Office wanted to hang on its wall and

that he was truthful in his statements to Gale during the telephone call.

18.     On or about October 15, 2015, Denver announced that Sheriff Diggins was being replaced as interim Sheriff by a new Sheriff.

19.     On or about October 16, 2015, Sheriff Patrick Firman took the oath of office and interim Sheriff Diggins was removed from the position as Sheriff.

**A brief overview of the Fraternal Order of Police**

20.     The Fraternal Order of Police (hereinafter the "FOP") is the largest professional police union in the country.  The FOP is both a trade union and a Fraternal Organization, having both Labor Lodges and Fraternal Lodges.  The FOP's mission is to function as a "full service member representation organization" involving benevolence, legal support, community involvement, and fraternalism.  The FOP leadership works on behalf of law enforcement officers from all ranks and levels of government to improve the working conditions of law enforcement officers and the safety of those they serve through education, legislation, information, community involvement, and employee representation.

21.     The FOP lobbies Congress and regulatory agencies on behalf of all law enforcement officers, provides labor representation, promotes legal defense for officers/deputies, and offers resources such as legal research.  The FOP also sponsors many important charities and foundations such as Easter Seals, Special Olympics, Kops n Kids, Law Enforcement Families Readiness Initiative (LEFRI), Miller/Coors Respect 21, Take 25 for Child Protection, the Danny Faulkner Foundation, Homeless Veterans Outreach, and the Veterans' Crisis Line.

22.     The FOP supports and is very involved in establishing memorials for fallen officers, and strongly supports programs for spouses and family members of police officers.

23.     Since the FOP's inception over 90 years ago it has grown to more than 2,200 local lodges and over 330,000 members in the United States, and in Colorado over 5,300 members in 63 lodges across the state of Colorado.

24.     FOP Lodge 27 serves the members of DSD.  FOP Lodge 27 is comprised of over 500 members of DSD.

**Gale's FOP leadership**

25.     Gale is one of the most influential leaders in the history of the FOP.

26.     In 1990, Gale became an FOP union steward or representative engaged in the activity of representing his fellow Denver Deputy Sheriffs.

27.     In 1992, Gale was elected as the FOP Lodge 27 Sergeant at Arms.

28.     From 1994-1998, Gale served as FOP Lodge 27 Vice President.

29.     In 1997, Gale was elected as a National Trustee representing the Colorado FOP on a national level.

30.     In 1998, Gale became the FOP Lodge 27 President.  Gale was elected FOP Lodge 27 President in 1999 and then re-elected as the FOP Lodge 27 Present in 2001.  Gale served as FOP Lodge 27 President until 2003.

31.     In 2006, Gale was elected as the Colorado FOP State President serving over 5,000 FOP members statewide.  Gale was re-elected in 2008, 2010, and 2012 as the Colorado FOP State President.  In sum, Gale served as the Colorado FOP State President from 2006 until 2014.

32.     In 2007, Gale was elected at the National FOP Second Vice President (which is the 5th highest ranking office in the National FOP).  At all relevant times leading up to and at the time of his termination, Gale served as the National FOP Second Vice President.

**Gale's speech is protected by the First Amendment**

33.     Denver is the only Sheriff's Department in the State of Colorado that does not have an elected Sheriff.  Instead, Denver has an elected Mayor that appoints a Manager of Safety to oversee, in relevant part, DSD.

34.     On or about January 1, 2014, Denver Mayor Hancock appointed Defendant O'Malley as the Executive Director of the Department of Safety.

### a.     Gale's Committee Speech

35.     In April of 2014, then-Sheriff Gary Wilson organized a committee to review the current training curriculum, policy, philosophy, and practices of DSD.  At the time, Denver was mired in scandal and controversy related to several high profile use of force cases including, but not limited to, Emily Rice, Marvin Booker, and the Jamal Hunter cases.

36.     The committee consisted of several members from the Department of Safety's Office including Deputy Director Christopher Lujan, Deputy Director Jess Vigil, and Civilian Review Administrator Shannon Elwell.  Additionally, Defendant O'Malley attended several of the committee meetings.  The other participants on the committee included a person from the Mayor's office, members of the public and community and religious organizations, as well as members of the Sheriff Department including Sheriff Gary Wilson.

37.     Politically, Denver seemed to have an agenda that was designed to significantly change how DSD uses force and scale back the authority of DSD to use force.

38.     Gale, who was appointed to the committee by Sheriff Wilson, worked openly to convince the committee members to adopt the FOP's longstanding position that the Denver

Deputy Sheriffs and the Denver Sheriff Training Academy needed to be certified pursuant to the minimum standards of the Peace Officer Standards and Training ("POST") in Colorado.

39.     During Gale's time on the committee it was clear that representatives from the Mayor's office and the Department of Safety's Office did not favor the position advocated by Gale on behalf of the FOP that Denver Deputy Sheriffs should be POST certified.  Publicly, DSD did not support Gale's position that Denver Deputy Sheriffs should be POST certified.

40.     During his time on the committee, Gale also advocated his position on behalf of the FOP that Denver Deputy Sheriffs should be empowered with additional law enforcement powers, such as arresting authority, as a result of POST certification.  Historically, in contract negotiations Denver has used the fact the Denver Deputy Sheriffs are not POST certified as a justification for paying Denver Deputy Sheriffs less than Denver Police Officers.  Needless to say, Gale's position on behalf of the FOP was met with strong opposition from the City and County of Denver by way of the Mayor's Office, and the Department of Safety's Office.

41.     Gale's work on the committee continued until early July, 2014, when Denver placed him on administrative leave pending investigation into the alleged preferential treatment of Deputy Sheriff Captain A.Z.[1]  In addition to silencing Gale's FOP voice on the committee, which was in opposition to the position of the Defendants, members of the committee from the Department of Safety's Office made derogatory comments about Gale which were designed to discredit Gale and the position Gale took on behalf of the FOP and its members.

---

[1] In the interest of protecting the privacy of a non-party, and for consistency of reference, Gale will refer to that individual as "A.Z." throughout this Complaint.

42.     Gale's committee speech was on matters of public concern.  Specifically, Gale's advocacy of the FOP's position that Denver Deputy Sheriffs should be POST certified and be empowered with additional law enforcement powers such as arresting authority bears on the training and certifications that Denver Deputy Sheriffs possess to fulfill the ultimate mission of ensuring the safety of the public.  In addition to public safety, enhanced training bears on the issue of the efficiency and integrity of law enforcement within the City and County of Denver, the role of the Denver Deputy Sheriff, and ultimately the use of public funds not only for training but also for issues related to pay of Denver Deputy Sheriffs.

43.     The aforementioned issues were not only communicated publicly by Gale, but the committee meetings were also attended by members of the public and covered by local media outlets including the Denver Post newspaper.

44.     Gale did not provide his committee speech as part of his "official" job duties as a DSD Captain or as an acting Division Chief.  In fact, Sheriff Wilson invited him to be a member of the committee due to his position within the FOP and his substantial influence with the rank and file members of DSD by virtue of his FOP leadership.

**b.      Gale's Speech Pursuant to a Lawful Subpoena**

45.     On or about September 8, 2014, Gale was served a lawful subpoena to attend and give testimony before the Career Service Hearing Office in the Disciplinary Appeal of Sgt. Ned St. Germain, Appeal No. 24-14 (hereinafter "St. Germain Trial").  *See* Subpoena to Testify attached hereto as **Exhibit 1**.

46.     Gale had a legal duty to comply with the lawful subpoena.

47.     On or about September 24, 2014, Gale complied with the lawful subpoena and attended and gave testimony before the Career Service Hearing Office in the St. Germain Trial.

48.     Gale did not provide his testimony in the St. Germain Trial as part of his official job duties as a DSD Captain, as an acting Division Chief, or as an employee of DSD and/or the Department of Safety.

49.     In fact, at no point was Gale asked by Denver or the Department of Safety to provide testimony in the St. Germain Trial pursuant to his official job duties and responsibilities.

50.     Further, at no point did Denver or the Department of Safety request a Subpoena to Testify for Gale nor did they ever serve a Subpoena to Testify on Gale.  Instead, Sgt. St. Germain, as the Appellant in the St. Germain Trial, requested and served a Subpoena to Testify on Gale.

51.     Gale's testimony in the St. Germain Trial was on matters of public concern.

52.     For example, the St. Germain Trial concerned an allegation that Sgt. St. Germain engaged in inappropriate force by deploying a TASER on an inmate.  Clearly, the gravamen of the St. Germain Trial concerned inmate safety, officer safety, the use of force by a Denver Deputy Sheriff, and ultimately the efficiency and integrity of DSD as it concerns the application of the use of force on a member of the public.

53.     The St. Germain Trial was also highly publicized as it was covered by numerous media outlets including the Denver Post.  Additionally, the St. Germain Trial was open to the public under Denver policy and Gale's testimony was available for public consumption.

54.     On or about September 24, 2014, Gale provided testimony that was critical of Denver's decision to discipline Sgt. St. Germain for the alleged unreasonable use of force.

Specifically, Gale testified that he felt a violation of the use of force could not be sustained, which was in direct contradiction to the testimony and decision of Deputy Manager of Safety, Jess Vigil. *See* Gale Testimony attached hereto as **Exhibit 2**. Additionally, Gale's testimony in the St. Germain Trial was contrary to the findings of Civilian Review Administrator Elwell.

55.     Gale's testimony in the St. Germain Trial is discussed in the decision of the Career Service Hearing Officer and the Career Service Board, both of which are publicly available on Denver's web site.

56.     Tellingly, Deputy Manager of Safety Vigil and Civilian Review Administrator Elwell, whom Gale contradicted in the St. Germain Trial, were the same two representatives of the Department of Safety's Office that were present at Gale's pre-disciplinary hearing on or about January 6, 2015 (less than four months later).

57.     Neither Vigil, Elwell, nor O'Malley have any experience as a member of the uniformed law enforcement community, such as a sheriff's department or a police department.

58.     Gale's testimony did not include any personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest. Instead, Gale's testimony concerned the social, political, safety, and financial interests of the public. Gale testified regarding the policy involving welfare of inmates and the obligation to protect the welfare of inmates together with the fact that a Denver Deputy Sheriff is charged with the duty of protecting an inmate from self-harm and protecting against threats to Denver Deputy Sheriffs and other staff employed by Denver. Ultimately, Gale's testimony was relevant to the public's evaluation of the performance of a governmental agency, *i.e.*, DSD.

### c.      Gale's Speech Regarding the Marvin Booker Case

59.     On or about July 9, 2010, Marvin Booker died while in the custody of the Denver Sheriff Department.  His family subsequently filed a lawsuit against Denver.

60.     The Marvin Booker trial received public attention, including vocal pro-Booker supporters.

61.     In October, 2014, Gale organized a rally of Denver Deputy Sheriffs that took place in front of the DDC for the purpose of giving a voice to the Denver Deputy Sheriffs regarding the negative portrayal of them in the media.  This rally took place during the Marvin Booker trial.

62.     Gale organized the rally as the members of FOP Lodge 27 felt there was a lack of support for Denver Deputy Sheriffs from the Denver Mayor's office and the Department of Safety's Office.

63.     Gale's efforts to organize the rally included numerous phone calls to FOP Lodge 27 members wherein he orally announced the date, time, and location of the rally.  Additionally, Gale authored a letter that was sent to FOP Lodge 27 members.  *See* Denver Deputy's Rally for Support and Respect! Letter attached hereto as **Exhibit 3**.  Gale set up the order of speakers and drafted talking points and narratives for both Mike Violette (Executive Director of the Colorado State FOP Labor Council) and Michael Jackson (FOP Lodge 27 President).  Gale arranged for the audio equipment rental and paid for said audio equipment rental with his State FOP credit card.  Next, Gale authored and sent out a press release to media contacts.  Finally, Gale conducted multiple interviews with reporters via telephone and in person discussing the purpose behind the political rally.

64.     On or about October 4, 2014, Gale also drafted a "Letter of Support" as the National 2nd Vice President of the FOP.  *See* Gale's Letter of Support attached hereto as **Exhibit 4**.  Gale's Letter of Support was publicly disseminated throughout the FOP members employed by DSD and also provided to members of the media at the rally.

65.     Upon information and belief, Defendants were well aware of Gale's speech (as set forth more fully in the above paragraphs) related to the Booker rally and did not approve of said speech.  In fact, Gale's speech was contrary to Defendants' media strategy related to the Booker case which was to offer the position of "no comment," *i.e.,* to stonewall the public, and not provide public support for the Denver Deputy Sheriffs either.  Defendants held this media position from late 2013 through the jury verdict against Denver in the amount of $4,650,000.00.  Defendants' failure to support its deputies publicly had an adverse impact on the morale within DSD and were in an effort to defeat transparency in government.

66.     Gale did not provide his speech related to the Booker rally (as set forth more fully above) as part of his "official" job duties as a Captain, as an acting Division Chief, or as an employee of DSD and/or Department of Safety.  Gale was not in uniform, acting in any official capacity as a DSD Captain or acting Division Chief, nor was he being paid by Denver for his speech related to the Booker rally.

67.     At all relevant times, Gale's speech related to the Booker rally was on matters of public concern such as the safety of officers and inmates.  In fact, in Gale's Letter of Support he expressly states, "[T]he safety of officers and inmates is a matter of serious public concern and any negative effect on the ability to maintain order in a jail facility ultimately affects the community's safety in a larger sense." *Id.*

13

68.     Gale's union activity and specifically his advocacy on behalf of the FOP Lodge 27 members and the National FOP is "political speech" that involves matters of public concern. Gale's interest in expressing the views of the FOP outweighs Defendants' interest in regulating that political speech.

**d.**     **Gale was the FOP Spokesperson During Collective Bargaining Negotiations Against the Direction of Defendant O'Malley**

69.     On or about October 1, 2014, FOP Lodge 27 was involved in collective bargaining negotiations with Denver.  Gale was a participant and the spokesperson on behalf of FOP Lodge 27.  FOP Lodge 27 was the bargaining agent on behalf of DSD employees against the City and County of Denver in the labor contract negotiations.

70.     Gale has served as the leader of the FOP Lodge 27 negotiations team since 1995.

71.     However, at the commencement of the collective bargaining negotiations, FOP Lodge 27 President Mike Jackson was advised by interim Sheriff Elias Diggins that Defendant O'Malley did not want Gale to participate in the collective bargaining negotiations on behalf of the FOP.  Sheriff Diggins confirmed Defendant O'Malley's position with respect to Gale's participation during a brief conversation he had with members of the FOP negotiation team, including Gale, in the hallways of a City and County of Denver building.

72.     Despite O'Malley's unlawful desire for Gale not to participate in the collective bargaining negotiations, Gale continued to participate and actually led the collective bargaining negotiations on behalf of the FOP.  In fact, from October 1, 2014, through November 15, 2014, during the course of the collective bargaining negotiations, Denver and FOP Lodge 27 (which was led by Gale) had approximately 12-15 collective bargaining sessions.  O'Malley personally

14

attended and sat across the table from Gale during at least two of the collective bargaining sessions.  Each collective bargaining session that O'Malley failed to attend was attended by at least one other representative or agent of the Department of Safety's Office who was, upon information and belief, designated by O'Malley.

73.     The collective bargaining negotiations between Denver and FOP Lodge 27 were particularly contentious.  Denver made numerous declarations (by and through its attorneys as well as Mayor Hancock's Chief of Staff) that Denver Deputy Sheriffs were costing Denver money by subjecting it to multiple lawsuits.  Gale, as the leader of the collective bargaining efforts on behalf of FOP Lodge 27, was the most vocal in responding to and rebutting Denver's degrading and disingenuous comments and negotiating tactics.  Upon information and belief, Gale's speech angered the Defendants.

74.     Gale's FOP political activities, association, and/or speech, particularly those related to these collective bargaining negotiations, were aimed at securing a new contract on behalf of the collective bargaining representative, *i.e.*, FOP Lodge 27.  Gale did not provide his speech related to the collective bargaining negotiations (as set forth more fully above) as part of his official job duties as a Captain, as an acting Division Chief, or as an employee of DSD and/or Department of Safety.

75.     Gale's union activity, and specifically his advocacy on behalf of the FOP Lodge 27 as the bargaining agent/representative, is "political speech" that involves matters of public concern.  Gale's political speech designed to secure a new contract on behalf of the bargaining agent outweighs Defendants' interest in regulating that political speech.

e.       **Gale's Speech at the Colorado Roundtable Discussion for "Race, Policing and Justice"**

76.      On December 29, 2014, Gale participated as an FOP representative (and not as an employee of DSD and/or Department of Safety) in a community forum that was organized by two state legislators, Representative Rhonda Fields of Aurora and Senator Mike Johnston of Denver.  The community forum was entitled "Race, Policing and Justice" and it was a two-hour meeting at the Ralph L. Carr Colorado Justice Center.  The community forum included district attorneys, lawmakers, chiefs of police, sheriffs, community, and criminal justice activists.  Among those present at the community forum were Executive Director of Safety Stephanie O'Malley, Denver Police Chief Robert White, and Interim Denver Sheriff Elias Diggins.

77.      The community forum was a discussion on race relations and potential legislation aimed at police reforms.  At that time, the deaths of unarmed black men at the hands of police officers in Ferguson, Mo., and New York City were a hot topic of discussion locally and nationally.  O'Malley offered commentary at the community forum regarding her views on the proposed legislation.

78.      Gale made public statement at the community forum that were contrary to some of those taken by Defendants.  Specifically, Gale stated that one of the central reasons for distrust of law enforcement by the community is the politicizing of policy and disciplinary decisions by elected officials and political appointees.

79.      O'Malley was appointed to the position of Executive Director of Safety by Mayor Hancock.  O'Malley is the daughter of former Mayor Wellington Webb, political supporter of Mayor Hancock.

80.     Gale further vocalized that rank and file officers/deputies do not have confidence in political appointees who are placed in positions to direct the policy of law enforcement in Denver but do not have any previous public safety or law enforcement experience.

81.     Significantly, O'Malley has no prior law enforcement and/or public safety experience.

82.     Gale further stated at the community forum that these political appointees lack any prior public safety experience and are unlikely to fully understand or bring real solutions to the problems facing law enforcement and the community.  Finally, Gale publicly stated that there were no real or meaningful community engagement efforts in Denver by the Department of Safety and that the efforts being put forward were mostly window dressing.

83.     Upon information and belief, O'Malley was not pleased with, and even visibly angered by, Gale's public speech.

84.     Gale did not provide his speech at the community forum (as set forth more fully above) as part of his official job duties as a Captain, an acting Division Chief, or as an employee of DSD and/or Department of Safety.  Gale was not in uniform, acting in any official capacity as a DSD Captain or acting Division Chief, nor was he being paid by Denver for his attendance or speech at the forum.

85.     Gale's speech did not include any personal grievances, complaints about conditions of employment, or expressions about other matters of only personal interest.  Instead, Gale's speech concerned the social, political, safety, and financial interests of the public as it concerns race relations, legislation aimed at police reforms designed to enhance the community's perception of law enforcement, the relationship between the community and members of law

enforcement, and ultimately the safety and welfare of not only the community at-large but also law enforcement officers at a time when society was demonizing the profession and political appointees refused to properly show support for law enforcement officers and deputies.

86.     Gale's union activity, right to association, and specifically his advocacy on behalf of the FOP and its members at this community forum is "political speech" that involves matters of public concern.  Gale's political speech was designed to advocate, as an FOP representative, the views and positions of the FOP and as such outweigh Defendants' interest in regulating that political speech.

87.     Having had enough of Gale's speech, Defendants terminated Gale's employment less than 30 days later, *i.e.*, on January 21, 2015.

88.     Defendants' termination of Gale's employment was purely an effort to silence him, and the alleged policy violations by Gale were merely pretext.

89.     The termination of Gale was direct retaliation due to Gale's speech.

**The sham termination case against Gale**

90.     Denver Sheriff Department Captain A.Z. was arrested while off-duty on June 15, 2014, for charges related to an alleged domestic violence incident.

91.     A new and inexperienced DSD Internal Affairs Sergeant was assigned to report to Denver Police Department District 5 to meet up with A.Z.

92.     When the Internal Affairs Sergeant arrived, A.Z. was not yet there.  Once A.Z. arrived, the Internal Affairs Sergeant met with her and A.Z. asked the Internal Affairs Sergeant to call Captain Gale because of his leadership role in the FOP union, of which A.Z. was a member.

93.     Afterwards the Internal Affairs Sergeant, A.Z., and at least one Denver Police Department officer went to A.Z.'s house.  Once A.Z. finished her business there, Denver Police released A.Z. into the Internal Affairs Sergeant's custody.  The Internal Affairs Sergeant then drove A.Z. to the jail, where A.Z. was taken through the booking process.  When it came time for A.Z. to change into inmate clothing, A.Z. asked the Internal Affairs Sergeant if A.Z. could stay in civilian clothing.  Captain Gale's order to the watch commander who was on duty at that time, however, was definitive: A.Z. had to be treated like any other inmate.

94.     Captain Gale had previously spoken with then-Sheriff Wilson about A.Z., and Wilson stated that A.Z. was not to be given any preferential treatment.  Captain Gale made this clear to the watch commander on June 15, 2014.

95.     After A.Z.'s request to wear civilian clothing was denied, A.Z. proceeded to change into the assigned inmate clothing.  Because A.Z. was a current member of law enforcement, A.Z. was designated to be separated from the general inmate population.  A.Z. was ultimately housed in the medical section of the jail.  Once A.Z. was situated in a cell, the Internal Affairs Sergeant left for the night.  At some point later on June 15, 2014, Captain Gale visited A.Z. at the jail.  Captain Gale made clear to A.Z. that A.Z. would have to be treated like any other inmate.

96.     The next day, June 16, 2014, A.Z. was scheduled to appear in court for arraignment.  Before the arraignment, a DSD Sergeant had A.Z.'s civilian clothes brought up from property and asked the Internal Affairs Sergeant if A.Z. could change into civilian clothes before the arraignment.  The Internal Affairs Sergeant then took A.Z.'s clothes to A.Z. and stood outside the sergeant's office while A.Z. changed into civilian clothes.  Inmates are not allowed to

change into civilian clothes before being released, and allowing A.Z. to do so was a policy violation and preferential treatment.

97.    Captain Gale had no part in A.Z.'s changing into civilian clothes before the arraignment.

98.    The time of A.Z.'s arraignment was changed, but it still went forward on June 16, 2014.  At the arraignment A.Z. was represented by her attorney.  Before the arraignment commenced, A.Z. entered with her attorney via the secure side entrance, *i.e.*, not through the public entrance.  In the first moments of the arraignment the advisement of rights and reading of the allegations was waived.  The court proceeding then focused on modification of a mandatory protection order so that A.Z. could carry a firearm while on duty.  In fact, Gale was in the courtroom specifically to address the protection order issue, at the request of A.Z.'s attorney.

99.    At the conclusion of the court proceeding, A.Z., the Internal Affairs Sergeant, A.Z.'s attorney, the DSD Sergeant, Gale, and others remained in the courtroom.  At least seven individuals were present, other than Gale.  Ultimately, A.Z. left the courtroom through the public entrance and got into a vehicle driven by two other DSD employees.

100.    Of the seven individuals other than Gale present, only three stated that Gale ordered that A.Z. could leave through the public entrance.  One of those three was interviewed by the Denver Police Department Internal Affairs eight days after the incident and did not state that she heard Gale give any such order to A.Z. to leave though the public entrance.  However, after a meeting with the Denver City Attorneys' office several months after her interview with DPD IAB, she was able to recall such an alleged order from Gale.  Notably, after this meeting with the Denver City Attorneys' office, she stated that she was in fear of retaliation from Denver.

101.    All three individuals were inconsistent in their account of the alleged order.

102.    Some had significant motivation to distract attention from their own policy violations in allowing A.Z. to change into civilian clothes before the arraignment.

103.    According to Gale, he made a statement about leaving through the public entrance, but it was directed to A.Z.'s attorney and misunderstood by the three individuals mentioned above.  A.Z.'s attorney had entered the courtroom through the secure side entrance, and asked Gale whether he should go back out through the secured area.

104.    As soon as Gale became aware that A.Z.'s release may have been improper, he took steps to correct the situation and have her return to go through the formal release process. Gale received a call from a DSD Captain who informed Gale that A.Z.'s release paperwork had not been completed.  Gale then called the officers who were driving A.Z. and ordered them to bring A.Z. back.  Gale then went to the Records Unit to determine what had gone wrong with A.Z.'s release.

105.    After the arraignment, the Internal Affairs Sergeant immediately blamed Gale for the release.  The Internal Affairs Sergeant's account of the alleged order by Gale has varied significantly over time.

106.    The Internal Affairs Sergeant's credibility is also suspect because of her motive to direct blame to someone other than herself, *i.e.,* Gale, insofar as it was the Internal Affairs Sergeant, not Gale, that allowed A.Z. to change into civilian clothes before A.Z.'s court appearance.  Allowing an inmate to change into civilian clothes prior to their release was unprecedented and a violation of policy by the Internal Affairs Sergeant.  It was the Internal Affairs Sergeant that had authority over A.Z. (as IAB Sergeant at the time, the Internal Affairs

21

Sergeant acted with the direct authority of the Sheriff) and allowed A.Z. to leave through the front door of the courtroom, thus the Internal Affairs Sergeant would be responsible for that policy violation as well.  Tellingly, upon information and belief, to date Defendants have not imposed any discipline on the Internal Affairs Sergeant related to the A.Z. incident.

107.    Gale's account of the incident has been clear and consistent from the very beginning: he did not order or authorize the release of A.Z. directly from the courtroom.  He assumed A.Z. had already been released because she was in civilian clothes.  He did not order her release directly from the courtroom.  He directed A.Z.'s attorney to leave through the court entrance, rather than the secured side entrance.  Finally, when confronted with the statements of others that Gale ordered the release, Gale presumes that the few individuals making such statements misunderstood Gale's direction to A.Z.'s attorney.

**Defendants' violation of Denver Sheriff Department Departmental Order 1530.3A**

108.    The termination of Gale's employment was contrary to the DSD Order governing complaint and discipline procedures, *i.e.*, Department Order 1530.3A (hereinafter the "Department Order" and attached hereto as **Exhibit 5**).

109.    The nearly-total failure to comply with the Department Order is additional evidence of pretext and evidence of the lengths that Defendants will go to hang their FOP trophy on the wall.  Defendants violated as least six requirements of Defendants' own Department Order.

110.    First, the Department Order explicitly states that it is DSD that will "investigate complaints or allegations of misconduct or law violations."  *See* Department Order 1530.3A.  In this case it was the Denver Police Department, not DSD, that conducted the investigation.

111.    Second, the Department Order requires: "[t]he Sheriff will appoint personnel to the Conduct Review Office (CRO) who will be responsible for reviewing all completed investigations from the Internal Affairs Bureau and making recommendations to the Sheriff."  In this case the DSD CRO was not involved.  Rather, it was the Denver Police Department's CRO, and the Sheriff does not appoint personnel to the Denver Police Department CRO.

112.    Third, the "Sheriff has the responsibility to oversee the administrative disciplinary process, make decisions and enter orders with regard to matters ancillary to discipline…." (Ex. 5 at ¶ 7.)  Here, the Department of Safety initially excluded the Sheriff from the disciplinary process.  The Sheriff was surprised by this decision, because: "First and foremost, because I was the sheriff; second, because the sheriff is included in all disciplinary hearings regarding Denver deputy sheriffs; third, there was no reason for me to be excluded, in my opinion, from the hearing."  The Sheriff brought his concern to the Director of Safety, but had to go all the way up to Mayor Hancock to get the decision to exclude him reversed.  It goes without saying that if the Sheriff is excluded he cannot carry out the responsibilities required under ¶ 7 of the Department Order.

113.    Fourth, the Department Order requires that the pre-disciplinary hearing be conducted "in the presence of at least two Division Chiefs…."  No Division Chiefs were present for Gale's pre-disciplinary hearing.

114.    Fifth, the Department Order mandates that the pre-disciplinary hearing also be conducted "in the presence of…one or more representatives of the Conduct Review Office."  This obviously means the DSD CRO specifically.  The CRO referred to throughout the Department Order is that whose personnel are appointed by the Sheriff.  As stated above, the

Sheriff does not appoint anyone to the Denver Police Department CRO.  Thus, the fact that the

pre-disciplinary hearing was attended by a representative of the Denver Police Department CRO,

*i.e.*, Commander Battista, does not satisfy Department Order ¶ 12(A)(5).

115.    Finally, the Department Order makes clear that when discipline at a level higher

than a reprimand is warranted, the Sheriff "shall initiate that action by submitting a written

recommendation to the Executive Director of Safety for approval."  The written recommendation

"shall contain a written summary of [the Sheriff's] findings, the basis for any disciplinary

sanction recommended, and an explanation of how the sanction was determined."  In this case,

no written recommendation was ever made by the Sheriff.

116.    These six glaring violations of the Department Order governing discipline

procedures make it clear that the termination of Gale was a foregone conclusion and not even

Defendants' own disciplinary policies would stand in the way of hanging the FOP trophy of the

wall.

117.    The termination of Gale was intended to create a chilling effect on the FOP and

send a clear message to the members of FOP Lodge 27 as to what will happen to any member

who may provide truthful testimony under oath against Defendants, advocate against Defendants

for collective bargaining rights, or advance other political speech adverse to the interests of

Defendants.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 FIRST AMENDMENT VIOLATION – RETALIATION
### (ALL DEFENDANTS)

118.    Gale hereby incorporates by reference all averments in this Complaint.

119.    Gale was under a legal duty to comply with the lawful subpoena and attend and

give testimony before the Denver Career Service Authority in the Sgt. Ned St. Germain Trial.

120.    Gale did not speak as part of his official job duties.  Instead, Gale spoke as a citizen complying with his legal duty to respond to a lawful subpoena.

121.    Gale's speech involves a matter of public concern.  Gale's testimony did not include any personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest.  Instead, Gale's testimony concerned the social, political, safety, and financial interests of the public.  Gale testified regarding the policy involving welfare of inmates and the obligation to protect the welfare of inmates together with the fact that a Denver Deputy Sheriff is charged with the duty of protecting an inmate from self-harm and protecting against threats to the staff.  Ultimately, Gale's testimony was relevant to the public's evaluation of the performance of a governmental agency, *i.e.*, DSD.

122.    Gale's interest in complying with his duty to respond to a lawful subpoena and provide testimony under oath on matters of public concern outweighs the Defendants' interest in regulating his speech.

123.    As the National FOP Second Vice President (which is the 5th highest ranking office in the National FOP) and the leader and spokesperson for FOP Lodge 27 (DSD Lodge and Bargaining Agent), Gale's speech as outlined more fully above was nothing short of advocacy on behalf of the FOP and its members, and engaging in such activity (speech and association) is protected by the First Amendment to the U.S. Constitution.

124.    Gale's advocacy on behalf of the FOP and its members is "political speech" that involves a matter of public concern.

125.    Gale's interest in expressing his speech outweighs the Defendants' interest in

regulating that speech.

126. Gale's expression of his speech was the substantial or motivating factor driving Defendants' decision to terminate him. In fact, interim Sheriff Diggins' admission reveals the true intent of Defendants:

> when you start having people pushing back on policy, procedure and practice only because they can and they want to…these assassins that have been hired in that office [*i.e.* Manager of Safety's Office] don't care about anything but blood and they don't see the long term picture…all they care about is that they have a trophy that they think they can hang on their wall

127. Defendants' actions caused Gale to suffer injuries that would chill a person of ordinary firmness from continuing to engage in such constitutionally protected activity.

128. Defendants' acts were done under color of state law.

129. Defendants have established an official policy or unofficial custom against disagreeing with or opposing them in administrative disciplinary proceedings, in public forums, or in labor relations with employees who are also members of a union, such as the FOP. Defendants require obedience to this rule even in the face of lawful subpoenas, and irrespective of taking an oath to give truthful testimony. There is a pattern and practice of pressuring FOP members, such as Gale, to testify in a certain way when under subpoena and to agree with Defendants in labor negotiations, and in the public forum even while off-duty, in order to achieve an outcome desired by Defendants. Upon information and belief, based on their respective authoritative positions within the City and County of Denver and their adherence to follow and enforce a policy to defeat the Constitutional rights of Gale (as set forth more fully above), these Defendants collectively caused, ratified, and/or influenced the termination of Plaintiff.

130.    These official policies or unofficial customs were enacted and/or maintained by Defendants with deliberate indifference to the inevitable Constitutional injury that would be, and in the case of Gale was in fact, caused thereby.

131.    Defendants also ratified and approved the termination of Plaintiff's employment, including the pretextual basis for termination.  For example, Defendants vigorously fought to uphold the termination of Plaintiff's employment during an administrative appeal proceeding which had the effect of making the pretextual basis for the termination official, authorized, sanctioned, and approved by Defendants.

132.    Defendant O'Malley was cloaked in final policymaking authority by the City and County of Denver, Colorado with respect to the imposition of discipline, including the unlawful termination of Plaintiff's employment.  Defendant O'Malley also delegated certain authority to subordinates, including Deputy Manager of Safety Jess Vigil and Civilian Review Administrator Shannon Elwell.  That authority included the termination of Gale's employment, which was directed, authorized, approved, and/or ratified by Defendant O'Malley.

133.    Defendants engaged in the conduct described by this Complaint intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Gale's federally protected constitutional rights.

134.    Defendants' conduct proximately caused significant injuries, damages, and losses to Gale.  Specifically, Gale has suffered loss of wages, loss of job, loss of benefits, loss of seniority, other economic losses, emotional pain, suffering, humiliation, inconvenience, emotional distress, mental anguish, and loss of enjoyment of life.

135.    The actions of the Defendants violate the First Amendment to the United States

Constitution and 42 U.S.C. § 1983.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 FIRST AMENDMENT VIOLATION**
**– FREEDOM OF ASSOCIATION**
**(ALL DEFENDANTS)**

136.    Gale hereby incorporates by reference all averments in this Complaint.

137.    Plaintiff engaged in union activity and associated himself with one or more

organizations, or other people, as a part of that union activity, *i.e.*, the FOP.

138.    Plaintiff's protected union association was a substantial or motivating factor for

the Defendants' action in terminating Gale's employment.

139.    Defendants were acting under color of state law.

140.    Defendants' conduct proximately caused significant injuries, damages, and losses

to Gale.  Specifically, Gale has suffered loss of wages, loss of job, loss of benefits, loss of

seniority, other economic losses, emotional pain, suffering, humiliation, inconvenience,

emotional distress, mental anguish, and loss of enjoyment of life.

WHEREFORE, Plaintiff, Franklin Gale, respectfully requests that this Court enter

judgment in his favor and against the Defendants and grant:

(a)    Appropriate declaratory and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for emotional

distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering

allowed by law in an amount to be determined at trial;

(c)    All economic losses allowed by law;

(d)     Attorney's fees and the costs associated with this action;

(e)     Pre- and post-judgment interest at the lawful rate;

(f)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**JURY DEMAND**

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL CLAIMS AND ISSUES SO TRIABLE.**

Respectfully submitted this 28th day of September, 2016.

**ELKUS & SISSON, P.C.**

*/s/ Donald C. Sisson*
Donald C. Sisson
Scott D. McLeod
Lucas Lorenz
*Attorneys for Plaintiff*
ELKUS & SISSON, P.C.
501 S. Cherry Street, Suite #920
Denver, Colorado 80246
(303) 567-7981 (phone)
(303) 431-3753 (fax)
dsisson@elkusandsisson.com
smcleod@elkusandsisson.com
llorenz@elkusandsisson.com

Plaintiff's Address:
4378 Kirk Ct.
Denver, CO 80249